Thank you. Madam Clerk, will you please call the first case? 116-1951, Luis Cuadrado v. FAA Stations. Counsel, you may proceed. May it please the Court, good afternoon. Good afternoon, Chief Counsel. My name is Brent James on behalf of the plaintiff, Luis Cuadrado, and we are here today asking this Court to overturn the decision of the Workers' Compensation Commission, which fell against the claimant on the issues of the causal connection of his bilateral condition, and further found that the plaintiff exceeded his allowable choices of physicians under the Act. And I acknowledge that these both present questions of fact, so I will be concise in my argument today. To understand the causal connection issue, it's important to understand this accident and the other injuries that the claimant sustained. He was working as a drain and cement finisher for the defendant on April 21, 2011, and he was working at the bottom of a 40-foot shaft at a water retention facility when a co-worker fell 40 feet and landed directly onto his head, neck, and back, knocking him to the ground and onto his knees. It was a serious and undisputed accident. An ambulance was called to the scene and was transported to the emergency room where he complained of head, neck, and back pain, as you might expect having a grown man fall 40 feet and land right on top of you. And that really presents the crux of the causal connection issue, was the alleged delay in complaints regarding the bilateral knee condition and the alleged gap in treatment for the bilateral knee condition. We have the testimony of the treating surgeon, Dr. Pedramos, who ultimately performed a surgery to repair the chondromalacia of the patellofemoral joint on June 19, 2012, against the Section 12 examiner, Dr. Raab. Dr. Raab based his opinion of no causal connection based upon an alleged lack of any complaints of knee pain after the accident. That seems to be the central theme here. So what is the explanation for the delay in no complaints about the knee pain? Well, Dr. Raab did not know until presented the information on cross-examination. It was only four days after the accident, on April 25, 2011, the claim reported to his primary care physician, Dr. Shabria, that he did have bilateral knee pain. However, he was treating primarily for neck and back pain at this time,  so essentially the bilateral knee complaints were swept under the rug by the treating physicians. He was sent to occupational health, and there is references in the occupational health records specifically on June 17, 2011, where he was complaining about increasing left knee pain. Did he ever seek any treatment for his neck and his back prior to September 11? For his neck and his back, Your Honor? I mean for his knees until September 11. Aside from the complaints to the physicians, there was no formal treatment until he went to see Northwestern Orthopedic Institute on September 7, 2011. Okay. Well, there is a significant gap in any treatment, right? Correct. The claim testified that he had his pain, but it was masked by the neck and back pain he was getting treatment for. He was making complaints, and it simply was not being addressed. He did report to Northwestern in September and for the first time received actual treatment for the knee complaints and ultimately was referred to Dr. Pedramos in underwent surgery for the same. Dr. Rob's testimony was that if he were going to have these injuries as a result of that accident, he would have pain within one week. That was his testimony. He was confronted with a medical record where he complained of pain within four days, and he opined that contrary to my opinions in my report, this just doesn't sway my opinion because it's a vague reference to knee pain, and that's all there is to it. Well, what do you make of this? Dr. Bowman referred your client to Dr. Casey for evaluation, correct? That's correct. Is this correct? He did not see Dr. Casey or another doctor for his knees until he saw Dr. Pedramos on April 30, 2012? He saw Dr. Bowman at Northwestern. Excuse me. Is that correct, Your Honor? Yes. So Bowman refers him out for his knees. He doesn't see anybody for six, seven months, right? That's correct. What do you make of that? Well, at Northwestern, initially the orthopedic recommendation was that surgery wouldn't be warranted. There was a discrepancy in the MRI as to whether it showed a meniscal tear and whether surgery would aid in his condition of well-being, and I believe he was referred by Dr. Bowman to a pain management specialist. The claimant went on to attempt to heal his pain throughout that time because he was told by the orthopedic who essentially abandoned his care that there would be no treatment in the other way. Why wouldn't he abandon his care? Well, essentially, Dr. Bowman said from an orthopedic standpoint, there's nothing more I can do for you, and he sent him out of his way. He said, you gave him a referral. Well, it's not abandoning his care. He said, there's nothing else I can do for you. That's not abandonment. And he referred him. Abandonment is when the guy still needs care and the doctor said, I'm retiring. Go find yourself another doctor. Well, from the standpoint of needing additional treatment, the record demonstrates that he clearly did need additional treatment and that he underwent a very serious knee surgery by Dr. Pedramos, ultimately resulting in permanent limitations as outlined by a valid FCE. According to my understanding of this record, Bowman didn't refuse the treatment. Bowman recommended rehabilitation and referred him to Dr. Casey for further treatment. The commission that observes your claimant never went to see Dr. Casey and did not participate in any rehabilitation. He did not go see Dr. Casey, that is correct, and he did not pursue the recommended pain management or rehabilitation until a breakdown of additional pain in the second opinion with Dr. Pedramos from an orthopedic standpoint. So anything past Bowman is outside the chain. It is the claimant's position that Bowman essentially, the calling of maximum medical improvement from an orthopedic standpoint, is an abandonment of care. Well, if we don't agree with you, what's your argument? If the panel does not agree that it's an abandonment of care, it would fall outside of the two-doctor rule. That is stipulated pretty obviously. But given the fact that he sought treatment from Dr. Bowman, he was clearly having pain and problems, it's well documented in the record. Dr. Bowman washed his hands of him and says, I can't do anything more for you, you should try pain management. So you want us to announce a rule that if he goes to a doctor, the doctor then refers him specifically to another doctor by name, the claimant doesn't follow up, that's an abandonment. If the referral is for pain management or physical therapy, and from an orthopedic standpoint he says, you know, you're not a surgical candidate, I can't fix your knee, that is the doctor washing his hands of the claimant and abandoning him. Why do you keep ignoring the referral aspect of this? He gave him another doctor to go see and consult with. He doesn't do it. How is that abandonment? You're saying he washed his hands of him. He didn't. Referral to a different specialist, which is essentially saying, you know, pain management, you are going to be living with this pain forever. You're going to have to just learn to deal with this, and this is the best thing I can do for you, is to help you just learn to deal with these permanent problems, should constitute an abandonment when the option is there to have surgery. Abandonment is when the doctor says, I won't treat you, period. It's not when I diagnose you as being at maximum medical improvement for this event and I'm sending you to someone else for rehabilitation. That's not abandonment of a patient. That's quite a stretch on the term abandonment. From the claimant's standpoint, all he wanted to do was get better. Dr. Bowman refused to offer that opportunity to him, aside from ongoing pain management and rehabilitation, and he felt his care was abandoned, and he was forced to find another doctor to correct the deficiencies in his knee. Why didn't he go and see Dr. Casey? Dr. Casey was a different specialist, which could not perform the necessary surgeries as Dr. Bowman could have. Is it true that between the time that your client mentioned pain in his knees and part of a litany of ailments on April 28, 2011, that he sought no medical treatment for his knees until September 7, 2011, when he first saw Dr. Bowman? He was sent by a defendant to occupational health, and he was actively treating, and there are references in the medical records of occupational health of knee pain, primarily in the left knee. When are those references? What dates? That would be June 17, 2011. I believe the record is C-420. So it corroborates the claimant's testimony that he was having pain, and he was complaining to doctors, and it just was not getting addressed. And once again, given the nature and extent of his back and neck injuries, which were found compensable by the commission, I don't think it should be surprising that they were focused on the neck and the back, and the knees were essentially being swept under the rug. So he's having these serious knee problems, and then Bowman says, go talk to another doctor, whether he felt the band that he doesn't do anything until he sees his doctor, but almost seven months later? How does that bear on this tremendous pain that he's in? Well, when an orthopedic doctor from Northwestern tells you you're not a surgical candidate, the claimant believes it. And you're still having pain, so you don't see anybody then, ever again. The claimant attempted to work, and he attempted to grin and bear it and deal with it until the point where he had to seek a second opinion to deal with the problem. And what do we do with Dr. Rabb's opinion that there's no causal connection between the work injury and the bilateral knee injury? Given the information that Dr. Rabb bases opinion on, which was the lack of any complaints of knee pain, until several months after the initial accident, Dr. Rabb's opinion is based upon faulty foundation. Well, the commission knew that, because the commission specifically commented on it. They said the only complaints he made of knee pain were on April 25, 2011, when he, I think they put out part of a litany of complaints, namely complaint of neck and back injury, blurred vision, tightness in forehead, chest pain, weird dreams, along with his, quote, unquote, pain in his knees. And then never saw treatment until September the 7th, 2011. So the commission was well aware that there had been a statement of knee pain way back in April, but the commission turned around and said, nothing wrong with Rabb's opinion. The commission's decision is against the manifest way of the evidence for that very reason, in that it adopted the medical opinion, which was based upon faulty information and was not a credible opinion. Is there any other, you're pointing to a flaw because of the knee pain, or the commission's perception there was a lack of complaints about the knee pain, and yet he just alluded to they were aware of the fact that he had made at least one complaint earlier. So how does that jive with your allegation that there was no acknowledgment of that? It was Dr. Rabb's whole opinion in the reports, and his initial testimony was based upon the lack of any complaints of knee pain. But that's not the only thing they relied on. He based his opinion on the fact that there was no reference to any knee injuries in the ambulance report, nothing in the emergency room report. The MRI scans showed degenerative arthritis of the medial compartment and joints, and Perdomo's postoperative report confirmed that there was no tear in the medial meniscus. And while Perdomo provides a conflicting opinion, meaning the bilateral knee condition is causally related, Rabb says it isn't. And I'm trying to figure out why this is against the manifest way of the evidence. Well, as the arbitrator pointed out before being overturned by the commission, I think it's important to note as well that the record is void of any evidence whatsoever of any preexisting knee problems or complaints or medical treatment prior to our date of accident. Well, wait a minute. Did the accident cause degenerative arthritis? Well, of course there's an aggravation to the preexisting condition. Ah, so he did have a preexisting condition. We're not going to say he didn't have one. MRI shows degenerative arthritis of the medial compartment and femoral joints is what it shows. As Dr. Perdomo has testified, what we have here is unquestionably and undeniably a serious and debilitating undisputed accident. We have no history of knee pain that predates this accident, and we have 130 hours of surveillance of the claimants following the accident, and we have one day of that 134 hours. One day on November 18, 2011, which shows him kneeling on concrete, which is outside of his restrictions provided by his doctors. So it's simply just not plausible that this knee injury would have developed de novo, notwithstanding this accident that happened several months before he was complaining of knee pain, and receiving treatment for knee pain, excuse me, as he complained of knee pain in the week of the accident. So for those reasons, the commission's decision is against the method, as it didn't even consider his prior healthy condition of well-being. You got me lost on healthy condition of well-being. Degenerative arthritis is not a healthy condition, is it? Healthy in the sense that he received no treatment, suffered no pain. Asymptomatic maybe, but not healthy. It certainly was not symptomatic, and he certainly did not receive any treatment. He was not debilitated. He was not debilitated. Okay. That's good. Okay. I think your time is up. You'll have time to reply in five minutes. Thank you, Your Honor. Counsel, you may respond. Good afternoon, Your Honors Counsel. May it please the Court, my name is Nicole Wiesan. I represent the defendant in this matter, F.H. Passion, on behalf of Brady, Connelly, and Masuda. Your Honors, the defendant's position is fairly simple. We believe that in this matter the commission did as it was supposed to. The commission took into account quite a bit of evidence. They reviewed the evidence, they analyzed it, and they decided how much weight to place on each piece of evidence. The commission noted strengths and noted weaknesses in the various evidence, and then set forth within its decision the explanation of why they found the evidence to be in the favor in this matter of the respondent and against finding causation for the plaintiff. As has already been discussed, as we're here before you today, all parties have agreed and stipulated that the standard of review for the primary issue here of causation is that of the manifest weight of the evidence. In applying that standard to the facts and in the decision of the commission, we find that there simply is just not enough evidence to warrant overturning what the commission found. The commission was very clear on setting forth the evidence it relied upon. There's three main things that have been already obviously discussed, but I would like to just in brief add a little more. Number one, the lack of credible complaints. That's obviously very important and pretty major in this case. The commission looked at four specific dates of treatment that occurred relatively close in time to the date of accident and then all the way through September of 2011. It was very important to the commission's eyes that right away after this horrific incident, as counsel has described it, there were no complaints whatsoever of anything to the petitioner's bilateral needs. He was examined. I believe he testified head to toe while he was at the ER. He looked for everything. No complaints were made of pain in the knees. The petitioner then saw his primary doctor on April 25th. He did make some complaints that day. He mentioned some issues with his knees and then nothing else was mentioned until June of 2011. So April 25th was the mention of the knee pain as part of a quote-unquote litany of complaints? That is correct, Your Honor. But his point is it was mentioned, correct? Correct. And if I may point out, the petitioner continued to see that same primary doctor for the next couple of days. There's actually at least two more dates of treatment. I believe April 26th and April 28th where he returned, again, making no mention of anything with regard to his knees. The next time that the knees are actually mentioned is in June, June 17th of 2011. I believe counsel was in error when he mentioned that the left knee was the most bothersome at that point in time because, quite frankly, the medical records show that the right knee had greater complaints at that time. And I think that the commission pointed this record out, noting that with Dr. Padronos' theory of causation based on an asymmetry of the status of this individual's knees, he never looked at these records and therefore never saw that initially there was a right knee complaint worse than a left. And then lastly, we have the September 7th of 2011, which is the first time, five months after the date of accident, that there's actually any treatment whatsoever. This individual was seeing physicians for all their complaints, and this is the only time that he first went to go seek any actual treatment. The commission obviously weighed against him in the commission's mind, and then you've got Reb's testimony. Correct. And the commission also pointed out some issues and some problems with the petitioner's own credibility. Looking again at the September 7th, 2011 medical note, the commission found that it was important that what the petitioner described to his treating doctor that day was that he had the pain since the beginning, that he had made complaints, that he was told to ice his knees. None of that is supported by any of the evidence in the record. There's nothing to show that that actually any of those complaints were documented or told to the previous treating physicians. In addition of, I think, important, much relevant and was important to the commission, as they noted, the surveillance evidence showed that on November 18th, 2011, that this individual was not just on his knees. He was doing work as a cement mason. He was laying cement. He was using a trowel down on his hands and knees, doing this for a number of hours, and that directly contradicted his own testimony at trial. He was asked if he'd ever done any of this work, that exact work he used to do after the accident, and he testified that he did not. Lastly, in looking at the issues here between credibility between the physicians, again, that's an issue the commission sees all day, every day. It's within the realm of the commission to decide how much weight to give to the opinions, and in this matter, I believe that the commission made the right decision. They, again, reviewed a lot of evidence, reviewed it all, and set forth that although Dr. Robb might have not initially had that one record of a primary care physician, when you look at the overall scenario, Dr. Robb reviewed medical records from the initial case of accident, from the ER, from the doctors at Northwestern. He reviewed the actual MRI films. He reviewed the actual surveillance evidence. And quite frankly, at his deposition, he did review that April 21st, 2011 note. So he took a look at it. If the doctor had the opportunity to change his opinion, he could have revised it. And much like how the commission decision ended up, I think that it just wasn't strong enough evidence for anyone, either Dr. Robb or any of the commissioners, to find that that would break up or, I'm sorry, to find that that would find against causal connection in this matter. By contrast, there's some issues involved with the causation opinion of Dr. Pedronos. He didn't see this individual for one entire year, basically, since the date of accident, and on the first date of his evaluation, in his first record, he states specifically his causal opinion that there is absolutely no way that this is a degenerative condition and that it's 100 percent traumatic based on the asymmetry of the need. As I pointed out before, Dr. Pedronos didn't review some of the initial records. He didn't know what the initial complaints were. He testified he might not have even reviewed the initial MRI and certainly didn't see the surveillance, showing an individual who was making very serious complaints to the bilateral needs, but he was able to be down on those hands and knees and lay concrete and do the same kind of activities that he was doing prior to the date of accident. The argument that Dr. Pedronos was somehow in a better position to provide a causal connection opinion, I think, is completely lacking in merit because of the fact that that opinion was put out there, like I said, the first time you saw this individual, he actually diagnosed a municipal terror that wasn't there that you see in the operative report. The fact that he ended up conducting surgery, I think, in no way has any role or should have an effect or certainly have a negative effect, I guess, on Dr. Pedronos' credibility, and obviously that was taken into account by the commission. Lastly, just very briefly, with regard to the issue of choice of physicians, the issue really boils down, everyone has said the primary care physician was the first doctor that this individual chose to see. And then the question is, what happens with the second choice of provider? The doctors at Northwestern, much like your honors have already discussed a bit, the respondent's position is that there was no abandonment of care on behalf of the physicians. In October of 2011, they had a position for the new Dr. Bowen. He did okay, there was no surgery necessary. I don't think that saying no surgery is necessary means I'm cutting you loose or there's nothing wrong with you, but not a great condition is a surgical condition. And these very good doctors at Northwestern said, I don't think you're a surgical candidate. But he did offer another physician's information. It wasn't a second opinion. He gave a referral. That referral was never followed through. In November 2011, the physician the petitioner was seeing for his back was told to come back and said, maybe we'll address NFC even at the next time. And nothing happened. Nothing took place. No other treatment took place until April of 2012. Six months passed. I would argue that at some point we have to draw a line there. If the individual is not going to seek treatment that has been recommended, then quite frankly it would be our position that the petitioner is the one in this matter that abandoned his care. So therefore, in conclusion, it is the defendant's position that none of the commissioned findings on the issues presented before you today were against the manifest weight of the evidence, and we would respectfully ask that you please affirm the commission of the decision. Am I correct in my reading of the record that he got to Dr. Perdomo's on a referral from his lawyer? That is correct, Your Honor. Is that what he testified to? I believe he testified to it, and if not, it is in the record. In the first care that he sought after Bowman told him to go to Dr. Casey and for rehabilitation as he went to a chiropractic center, Gold Coast Wellness Center? Correct, Your Honor. And the plaintiff testified or attempted to testify that that was where he was going to seek physical therapy treatment. The record will show that he actually went to that provider on his own. He knew the gentleman. I believe it was Dr. Odishu that he was already aware of that he knew when he went there. And the records show that none of the treatment rendered at that location indicated any sort of physical therapy, and in fact it's chiropractic treatment. There was no referral by any physician during the course of this entire claim for any chiropractic treatment. Thank you, Counsel. Thank you. Counsel, you may reply. May it please the Court, just to address the issue of the claimant's credibility, there was no finding by the commission that he was per se not credible. This wasn't one of those situations. There was a reference to the credibility of his testimony concerning that specific referral, which he indicated that he was given a script for physical therapy. He ended up going to see said chiropractor. But there's no per se finding that the claimant's not credible. Counsel, let me ask you a question. The commission found Dr. Pedromos' opinion as unpersuasive, noting that he did not review the claimant's medical history. Is that true? He did not have the medical records before initially seeing the claimant. That's true. Well, wouldn't that be significant? In this case, it's not entirely significant. When you have a clear traumatic event and a causative factor, which is unquestionably, it was a game-changing causative factor. So it would not be significant in this case, given the clear line in the sand regarding that traumatic event being the game-changer, which caused the symptoms and thus the condition of Opie. Does the Court have any other questions? I don't believe we do. For foregoing reasons, the claimant respectfully requests the silent court reverse the decision at the end of this competition. Thank you. Thank you, Counsel. Both of your arguments in this matter will be taken under advisement, and a written disposition shall be issued.